UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RAMON SANTANA, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-14097-ADB |
| | * | |
| KELLY RYAN, | * | |
| | * | |
| Respondent. | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Petitioner Ramon Santana was convicted in February 2001 of two counts of murder in the first degree, possession of a firearm without a license, armed assault with intent to murder, assault and battery by means of a dangerous weapon, armed robbery, and armed home invasion. Presently pending before this Court is Santana's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. [ECF No. 1]. Having reviewed the parties' submissions, and construing Petitioner's pleadings liberally because he is proceeding *pro se*, this Court denies his petition for a writ of habeas corpus for the reasons set forth below.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Massachusetts Supreme Judicial Court ("SJC") provided an account of the facts as the jury could have found them, which is summarized in relevant part below. See Commonwealth v. Santana, 988 N.E.2d 825, 825–45 (Mass. 2013).[1]

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1) (2012). This presumption applies with equal force to findings of fact by state trial and appellate courts. Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002). Santana has not rebutted any of these facts by clear and convincing evidence as required by § 2254(e)(1).

Gregory Cantela, Sr. ("Gregory Sr.") and his friend Abraham Candelario were found shot to death in Gregory Sr.'s apartment in Holyoke, Massachusetts on January 3, 2000. Edrike Roman, Gregory Sr.'s seven-year-old stepson, discovered the bodies when he came home from school. Edrike also found his four-year-old brother, Gregory Jr., who was shot in the neck and chest, in his bedroom, where he had been watching a movie. Gregory Jr. told Edrike that his father's friend "Rev" shot him. Edrike asked his friend Louie, who had been waiting to play with him after school and was in the hallway outside the apartment, to get Louie's mother, Maritza Mattei. After Mattei got to the apartment, she attempted to comfort Gregory Jr. until medical help arrived, and Gregory Jr. told her, "[m]y father's friend shot my father, and he shot my father's friend, and he hit me in the face with the gun." Mattei said the friend's name sounded like "Riv."[2] When paramedics arrived, Gregory Jr. begged, "Don't let him shoot me again." When asked, "Who did this to you?" he replied that either "Rev" or "Reb" had shot him.

As paramedics transported Gregory Jr. to a hospital, the boys' mother, Elizabeth Garcia, telephoned from work after she had tried to reach Gregory Sr. earlier that day. Edrike told Garcia that Gregory Jr. said "Rev" shot him. When Garcia arrived home, she told police that "Rev" was a friend of her husband, and that she had known "Rev" for about five years. She went to the police station, where she identified a photograph of Petitioner as the person she knew as "Rev," and drove with police to several locations where "Rev" might be found. On the day after the shooting, a State trooper and a Holyoke police officer spoke with Gregory Jr. at the hospital; he told officers "Rev" shot him. The officers spoke with Gregory Jr. again on January 20, 2000 at another hospital, where he identified a photograph of Petitioner as the person who shot him,

---

[2] The SJC noted that "Mattei had some difficulty with English at the time of the shooting. In her statement to police, she said she thought the friend's name was 'Rick;' at trial, she testified that she was sure the name began with an 'R,' but it could also have been 'Rev' or 'Rick.'" <u>Santana</u>, 988 N.E.2d at 829 n.5.

circled the photograph, and wrote his name on it. The day after the shooting, Garcia asked police about a gold chain that she had given Gregory Sr. as a birthday gift and that he wore every day, including when she left for work on the morning of the shooting. Garcia described its distinctive "Cuban link" style, and on January 20, drew a picture of the chain.

On the afternoon of the shooting, Petitioner had planned to meet his sister Angelica Cruz outside a restaurant at 1:30 P.M., but Petitioner was twenty minutes late. While they shopped at a local mall, Petitioner gave Cruz two used PlayStation video games. Gregory Sr. and Candelario had been playing PlayStation at the time of the murder, but the cartridge was empty when police arrived at the scene. Petitioner was unemployed, had been using cocaine extensively in the previous weeks, and owed his drug connection several thousand dollars. Due to the outstanding debt, the "connect" refused to supply Petitioner with more drugs. In late December, Petitioner and two acquaintances had seen Gregory Sr. in his apartment with a large quantity of cash, and his friends knew he tended to have cash on hand. When Cruz and Petitioner returned home, their mother told Cruz that the police had been looking for Petitioner, and that he had to leave. His sister Yvette Negron found him sleeping on the couch in her New York City apartment on the morning of January 4.

On January 5, Petitioner arrived at the home of a childhood friend, Daniel Cotto, in Jersey City. Petitioner was wearing a gold chain, but later said he needed money and planned to pawn the chain, and he stopped wearing the chain the next day. After he had been at Cotto's apartment for a few days, Petitioner told Cotto that he had "shot two dudes" named "Abraham and Greg" in Massachusetts, and he had to "get out." He said he had shot each at least twice in the head, and showed Cotto an ammunition clip to prove he was not making it up. Petitioner also said he had to return to Massachusetts to kill the sole witness, "Joseph." He asked Cotto if he

could have Cotto's Social Security card as identification so he could go to Puerto Rico. When Cotto declined, Petitioner asked Cotto to take identification from Cotto's brother-in-law, but Cotto refused.

On January 12, 2000, Jersey City police officers arrested Petitioner on a fugitive from justice warrant on the street outside Cotto's apartment. Massachusetts State Troopers George Beaupre and Ronald Gibbons and Detective Emil Morales of the Holyoke Police Department left Massachusetts early that afternoon and arrived at Jersey City police headquarters at approximately 6:15 P.M. that evening to interview Petitioner. The interview began at 6:43 P.M. Beaupre told Petitioner he would read him his Miranda rights. Handing Petitioner a Miranda waiver card, Beaupre asked if he was able to read English. Petitioner replied that he could, and that he "knew his rights." Beaupre read aloud from his copy of the card, asking Petitioner to initial each line if he understood the respective right, and to let Beaupre know if he did not understand. Beaupre then asked if Petitioner wished to speak to the officers. He replied, "I will talk to you, but I'm not signing anything without a lawyer." Petitioner signed the card at 6:43 P.M. then added, "I'm not signing anything else."

Petitioner proceeded to answer questions for several hours. Around 10 P.M., they took a half-hour break so Petitioner could eat some takeout food the officers ordered for him. Sometime between 12:30 and 12:45 A.M., when Petitioner asked how Cruz was doing, Beaupre replied that she was worried about him, and that she had spoken with officers because she would "rather see [Petitioner] locked up, so I can see him, talk to him, and write to him. He would still be here with the family." Petitioner broke down sobbing uncontrollably "for five or six minutes," then said there had never been any "bad blood" between himself and Gregory Sr., and "what's right on the street isn't always right." After approximately five minutes, he stated he could not "say any

more." Beaupre and Gibbons left the room, and Morales stayed with him and engaged him in what the motion judge termed "conversation." Petitioner continued to speak, saying repeatedly he "didn't do it." Fifteen or twenty minutes later, Petitioner said that he could not "say anything more." The interview ended.

When the officers first arrived to interview Petitioner, his inventoried property was on a desk in the detective squad room. While Beaupre read the <u>Miranda</u> warnings, Gibbons "glanced" over at the desk and saw an unfolded receipt from a pawn shop, with the name "Jemma Loan Company" printed in large red and gold letters at the top. Gibbons observed that the ticket, in the name "Ismail Bonilla," was for a "10K chain & rel. pendant" and a "10K bracelet." Aware of Gregory Sr.'s missing gold chain, Gibbons recognized the pawn ticket as potential evidence. The police did not individually inventory the pawn ticket on Petitioner's property log, which contained an entry for "miscellaneous papers." The ticket remained in the custody of the Jersey City police until February 3, when Jersey City officers, acting on an affidavit from a Massachusetts officer, obtained a warrant to seize the chain, and the Massachusetts and Jersey City officers jointly executed the warrant.

Petitioner was arraigned in Jersey City on the fugitive from justice warrant on January 13. After Petitioner waived rendition on Tuesday, January 18, Jersey City officers sent a notice to Gibbons stating that Massachusetts police must pick up Petitioner "within [ten] days of the waiver date," and that they must do so on a day when the New Jersey courts were in session. The officers picked up Petitioner on January 24. As the cruiser left the sally port, Beaupre again read Petitioner his <u>Miranda</u> rights, and asked him to sign a <u>Miranda</u> waiver form. After a dinner stop, Petitioner said, "I will say the whole story, I will give a statement, but I want to collect my thoughts." There was no further questioning during the remainder of the trip. They arrived at the

Holyoke police station at approximately 10 P.M. Saying he wanted "to get it done," Petitioner asked to make a statement before being booked so he could sleep. Gibbons typed as Petitioner spoke, and a number of times, Gibbons had to ask Petitioner to slow down so he could enter everything accurately. Shortly before 1 A.M., Gibbons printed the statement. Petitioner reviewed and initialed each page, indicating written changes on several pages, and asked Gibbons to initial the changes. Petitioner signed the statement at 1:58 A.M.

On the first day of the trial, the judge conducted a voir dire to determine if Gregory Jr. and his brother Edrike were competent to testify. At the prosecutor's request, Beaupre asked both children if they had recognized anyone in the court room, and they named several people who had been there, but did not name Petitioner. After they left the court house, Gregory Jr. and Edrike both asked their mother, Garcia, whether "Rev" had been in the court room, and she replied that he had. Upon their continued questioning, she explained he had been sitting at the counsel table next to his attorney. Although the prosecutor learned from Beaupre shortly after the voir dire that the boys had not recognized "Rev" in the court room, he called Gregory Jr. to the stand the following day without disclosing this information to Petitioner. At the conclusion of his testimony, when asked to identify "Rev," Gregory Jr. pointed to the defendant's table. The prosecutor later stated he was "supris[ed]" when Gregory Jr. identified Petitioner as "Rev," but he did not request a sidebar or a recess in the trial proceedings prior to cross-examination. During a subsequent recess, after Gregory Jr. had been excused, the prosecutor spoke with Garcia and she told him about her conversation with her sons after they left the courthouse on the previous day.

After Gregory Jr.'s testimony, at sidebar the prosecutor described Garcia's actions and the boys' inability to identify "Rev" the previous day. Over the defendant's objection, the

prosecutor agreed to put before the jury Gregory Jr.'s inability to identify "Rev" through questioning of Garcia, the Commonwealth's next witness. The judge also allowed the defendant's motion, made before Garcia testified and then renewed after her testmony, that Gregory Jr.'s identification testimony be struck, and instructed in his charge that testimony which had been struck could not be considered. Immediately before closing arguments, the judge read a stipulation by the parties that Gregory Jr. had been unable to identify the defendant as "Rev" in the court room.

After Petitioner was convicted in February 2001, he timely filed his direct appeal, but the appeal did not proceed. In 2007, new appellate counsel was appointed and, in July 2009, Petitioner filed a motion for a new trial. In November 2009, the motion judge conducted a nonevidentiary hearing, and determined an evidentiary hearing was necessary. That hearing occurred in March 2010. The judge thereafter denied Petitioner's motion. The appeal from that denial was consolidated with his direct appeal. The SJC ultimately affirmed Petitioner's convictions. On October 24, 2014, Santana filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [ECF No. 1], along with his memorandum of law in support of the petition [ECF No. 5]. On July 20, 2015, Ryan filed her memorandum of law in opposition. [ECF No. 46].

## II.    LEGAL STANDARD

A federal district court's review of a state criminal conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA permits federal courts to grant habeas relief after final state adjudication of a federal constitutional claim only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court arrives at a conclusion opposite of that reached by the Supreme Court on a question of law or if the state court decides a case differently from the Supreme Court's decision on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an unreasonable application of Supreme Court precedent if the state court identifies the correct legal rule but unreasonably applies it to the facts. Id. at 413. An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (internal quotations omitted). Lastly, a court bases its judgment on an unreasonable determination of the facts if the decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see Sanchez v. Roden, 753 F.3d 279, 299 (1st Cir. 2014) (requiring petitioner show the state court decision applied clearly established law in a way that was "objectively unreasonable"). Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

## III.   DISCUSSION

In his petition, Petitioner presents six grounds for habeas relief: (1) the SJC's refusal to grant relief was an unreasonable application of Brady v. State of Maryland, 373 U.S. 83, 87 (1963) and its progeny after the prosecutor violated Petitioner's due process rights; (2) the SJC's

application of <u>Minnick v. Mississippi</u>, 498 U.S. 146, 147 (1990) to the facts of the case was

unreasonable because the trial judge should have suppressed the signed statement; (3) the SJC

was unreasonable in its application of <u>Miranda v. Arizona</u>, 384 U.S. 436, 473–74 (1966) and its

progeny in evaluating the police conduct after his arrest; (4) the SJC was unreasonable in finding

that if there was a violation of his Fourth Amendment rights regarding the seizure of the pawn

ticket, the chain, and all evidence derived from these items, it was not prejudicial; (5) other

serious constitutional errors require reversal of the SJC's decision; and (6) trial counsel was

ineffective for abandoning a "cocaine psychosis" defense and for failing to request a voluntary

intoxication instruction.

### A. Ground One: Unreasonable Application of <u>Brady</u>

In his first ground for relief, Petitioner claims the SJC unreasonably applied clearly

established Supreme Court precedent in holding he suffered no prejudice from the prosecutor's

failure to timely disclose Gregory Jr.'s inability to identify him. Additionally, Petitioner presents

three problems with the SJC's reasoning: (1) counsel lost the chance to include Gregory Jr.'s

failure to identify him in his opening; (2) counsel lost the opportunity to interview Garcia prior to

his opening so he could include her coaching of Gregory Jr. in his statement; and (3) counsel was

unable to structure his cross-examination of Gregory Jr. so as to highlight his inability to

recognize Petitioner as the alleged shooter only one year after the crime.

"The threshold question is what constitutes 'clearly established federal law, as

determined by the Supreme Court of the United States.'" <u>Clements v. Clarke</u>, 592 F.3d 45, 56

(1st Cir. 2010) (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 72 (2003)); <u>Kater v. Maloney</u>, 459 F.3d

56, 63–64 (1st Cir. 2006) ("[S]tate habeas petitioners may not seek release on federal law

grounds which have yet to be clearly established."). Pursuant to <u>Brady v. State of Maryland</u>, a

State violates a defendant's right to due process when it withholds "evidence that is material to his guilt or punishment." Cone v. Bell, 556 U.S. 449, 469 (2009) (citing Brady, 373 U.S. at 87); see United States v. Bagley, 473 U.S. 667, 682 (1985) (holding evidence is "material" within Brady's meaning when there is a reasonable probability that, had the prosecution disclosed the evidence, the trial proceedings would have resulted differently).

"Under Brady, the prosecutor has a duty to make available to the defense exculpatory evidence, including evidence useful for impeachment, possessed by the prosecution team or its agents." Lopez v. Massachusetts, 480 F.3d 591, 594 (1st Cir. 2007); see Giglio v. United States, 405 U.S. 150, 153–54 (1972) (noting nondisclosure of evidence affecting witness credibility falls within general Brady rules, but the rules do not automatically require a new trial whenever the defense could have possibly used late-disclosed evidence if it was unlikely to have changed the verdict). "To prevail on a federal Brady claim, 'a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment).'" Zuluaga v. Spencer, 585 F.3d 27, 30 (1st Cir. 2009) (quoting Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005)). The third "prong of the Brady analysis turns on whether a reasonable probability exists that disclosure of the evidence at issue would have altered the result of the proceeding." Zuluaga, 585 F.3d at 31. "It is a daunting task for a habeas petitioner to show that a considered opinion by the state's highest court is objectively unreasonable when that court has made an evaluative judgment . . . that [a] petitioner has not met the Brady standard for prejudice." Healy v. Spencer, 453 F.3d 21, 27 (1st Cir. 2006).

In Petitioner's case, the SJC reasonably applied <u>Brady</u> by expressly addressing Petitioner's contentions and then concluding that the delay in the disclosure did not prejudice him given the circumstances. At the outset, the SJC conceded that the prosecutor's failure to timely disclose Gregory Jr.'s inability to identify Petitioner was a failure of "constitutional dimension." <u>Santana</u>, 988 N.E.2d at 842. It reasonably determined that Gregory Jr.'s failure to identify Petitioner did not undermine confidence in the trial, however, both because the trial judge took immediate and strong action to eliminate prejudice, and because Gregory Jr. had confidently identified Petitioner as the shooter shortly after the crime took place. See <u>Murray v. United States</u>, 704 F.3d 23, 30 (1st Cir. 2013) (holding, under <u>Brady</u>, that withheld information must be material, and that evidence is material when there is a reasonable probability that the result of the proceeding would have been different, or in other words, that suppression of the evidence "undermine[d] confidence in the outcome of the trial" (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995)); <u>Cone</u>, 556 U.S. at 470 ("[F]avorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (quoting <u>Kyles</u>, 514 U.S. at 435)).

The facts as relied upon by both parties support the SJC's determination that the trial judge's actions were appropriate and that the other identification evidence against Petitioner was extensive. First, Gregory Jr. identified a photograph of Petitioner while at the rehabilitation hospital, and police testimony introduced details of that identification procedure. <u>Santana</u>, 988 N.E.2d at 843. Second, counsel was able to point to Garcia's coaching of Gregory Jr.'s identification testimony during his closing to suggest that Garcia coached other portions of his testimony as well. <u>Id.</u> Finally, while counsel could not highlight Gregory Jr.'s inability to

recognize Petitioner one year after the crime on cross-examination, he was able to elicit that Gregory Jr. "practiced" his testimony four times with the prosecutor and at home with his mother. Id. Therefore, habeas relief is denied as to Ground I because the SJC properly considered the whole record, discussed each of Petitioner's arguments, and reached a reasonable conclusion that Petitioner had not demonstrated Brady prejudice.

**B.      Ground Two: Unreasonable Application of <u>Minnick</u>**

Petitioner next contends that the SJC was unreasonable in concluding that the police did not violate his Fifth Amendment rights after the officers requested that he initial and sign a statement on January 24, when he had previously stated he would not sign anything without a lawyer present. Furthermore, he argues: (1) the officers' repetition of Miranda warnings was not sufficient to overcome his request for counsel; (2) he did not initiate his written, signed statement; and (3) the Commonwealth failed to prove the validity of his implicit Miranda waivers beyond a reasonable doubt.

"To protect the privilege against self-incrimination guaranteed by the Fifth Amendment . . . the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." Minnick, 498 U.S. at 147 (noting that once the accused requests counsel, officials may not reinitiate questioning "until counsel has been made available" to him); see Miranda, 384 U.S. at 473–74 ("If the individual . . . wishes to remain silent, the interrogation must cease."). Pressure from interrogation is "likely to 'increase as custody is prolonged,'" which could create a higher risk of a false confession. Maryland v. Shatzer, 559 U.S. 98, 105 (2010) (quoting Minnick, 498 U.S. at 153) (holding that the Edwards presumption of involuntariness ensures police will not take advantage of mounting coercive pressures by repeatedly attempting to question a suspect who previously requested counsel); see Edwards v.

Arizona, 451 U.S. 477, 484 (1981) ("[A] valid waiver of [the right to have counsel present] cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation . . . ."). The Supreme Court has noted, however, that Edwards does not foreclose finding a waiver of Fifth Amendment protections after a defendant requests counsel, provided the accused initiated the conversation with the authorities. Minnick, 498 U.S. at 156; see United States v. Fontana, 948 F.2d 796, 805 (1st Cir. 1991) (explaining that officers cannot subject an accused to further interrogation once he has expressed his desire for counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police").

The SJC was not unreasonable in concluding the trial judge did not err in admitting the written statement, because the court clearly outlined how Petitioner, and not the officers, voluntarily initiated the additional communication after the request for counsel. Santana, 988 N.E.2d at 832. First, Petitioner told police he understood his rights, signed waiver cards stating that he understood those rights, and affirmatively agreed to speak with the officers. Id. at 831–32, 837; see Michigan v. Mosley, 423 U.S. 96, 104–05 (1975) (holding that the accused understood the Miranda warnings after he orally acknowledged his understanding and signed a printed notification-of-rights form).

Second, 11 days after the initial interrogation, Petitioner initiated the conversation that led to his written, signed statement after the dinner stop in Connecticut by offering, unprompted and unsolicited, to make a formal statement, as corroborated by all three officers involved in transporting him from New Jersey to Massachusetts. Officer Beaupre's detailed and contemporaneous notes corroborate that Petitioner voluntarily initiated the conversation and was willing to make a signed statement. Santana, 988 N.E.2d at 832, 837. At the station, Petitioner

gave his entire statement with virtually no prompting, speaking so quickly that Officer Gibbons had to ask him to slow down, and reviewed it in "very meticulous" detail for over one hour before signing. Id. at 833, 837; see Edwards, 451 U.S. at 484–85 ("[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"); Minnick, 498 U.S. at 156 (noting Edwards does not foreclose a waiver of Fifth Amendment protections after counsel has been requested, provided the accused initiates the conversation or discussion with police). Because the SJC's conclusion that the trial judge did not err was not an unreasonable application of clearly established Supreme Court precedent, habeas relief is denied as to Ground II.

**C.      Ground Three: Unreasonable Application of <u>Miranda</u>**

Petitioner also asserts the SJC was unreasonable in its determination that police did not violate <u>Miranda</u> and its progeny by having him sign two <u>Miranda</u> cards and his written statement without counsel after he refused to sign anything without an attorney, and by continuing to speak to him after he cut off questioning.

> 1.      <u>Suppression of Petitioner's Miranda Cards</u>

Petitioner argues that the SJC was unreasonable in its conclusion that the trial judge appropriately admitted the signed <u>Miranda</u> cards from January 12th and 24th despite trial counsel's motion to suppress Petitioner's statements. He further argues that trial counsel was ineffective because he failed to move to suppress the statements based on a <u>Miranda</u> violation and that this was not a strategic decision by trial counsel, because it had never occurred to the attorney to move to suppress the <u>Miranda</u> cards themselves. Respondent counters that the

police's request for initials and a signature from Petitioner did not constitute "interrogation," and that failing to pursue a futile motion to suppress does not constitute ineffective assistance of counsel.

a.   Admission of the Miranda Cards

"Miranda established a bright-line rule making the warnings . . . conditions precedent to the admissibility of statements uttered by a suspect during the course of custodial interrogation." United States v. Melendez, 228 F.3d 19, 21 (1st Cir. 2000). There is no Fifth Amendment right to counsel for administrative matters. See United States v. Pacheco-Lopez, 531 F.3d 420, 423 (6th Cir. 2008) ("Miranda warnings are not . . . required for questions 'reasonably related to the police's administrative concerns.'" (quoting Pennsylvania v. Muniz, 496 U.S. 582, 601–02 (1990))); see also United States v. Sanchez 817 F.3d 38, 45 (1st Cir. 2016) (explaining that the "booking exception" turns on an "objective" test that asks "whether the questions and circumstances were such that the officer should have reasonably expected the questions to elicit an incriminating response").

When delivering Miranda warnings to suspects, police do not engage in express questioning that is likely to elicit an incriminating response, but instead use words "normally attendant to arrest and custody" to make sure they understand their rights. South Dakota v. Neville, 459 U.S. 553, 564 n.15 (1983) (explaining that officers use virtually the same words when giving Miranda warnings to all suspects they interrogate, and such inquiries, as with requests to submit to fingerprinting or photography, are outside the basic Fifth Amendment protection); United States v. Genao, 281 F.3d 305, 310–11 (1st Cir. 2002) (noting that remarks that are brief, not worded in a confrontational manner, or do not accuse the defendant of any crime are preliminary comments and not Miranda violations). Therefore, the SJC reasonably

concluded that the trial judge properly admitted the cards, both because signing <u>Miranda</u> waiver forms is an administrative act and not custodial interrogation, and because there is no Fifth Amendment right to counsel for administrative matters.

b.     <u>Ineffective Assistance</u>

To succeed on an ineffective assistance of counsel claim, a petitioner must show first, that counsel's performance fell "below an objective standard of reasonableness," and second, that the deficient performance prejudiced the petitioner's case. <u>Smoak v. United States</u>, 12 F. Supp. 3d 254, 264 (D. Mass. 2014) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984)) (explaining that <u>Strickland</u> establishes a strong presumption of reasonable professional assistance); <u>see</u> <u>Tevlin v. Spencer</u>, 621 F.3d 59, 66 (1st Cir. 2010) ("[A] lawyer's performance is deficient under <u>Strickland</u> 'only where . . . counsel's choice was so patently unreasonable that no competent attorney would have made it.'"). Even if a lawyer's performance is constitutionally unacceptable, a court must withhold relief unless a petitioner also demonstrates prejudice, meaning that "but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." <u>Sleeper v. Spencer</u>, 510 F.3d 32, 39 (1st Cir. 2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> The <u>Strickland</u> standard is broadly deferential to the strategic and tactical decisions of trial counsel, making them "virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 689–90. Further, "where [a] petitioner's claim was adjudicated on the merits by the state court . . . [that] petitioner must also satisfy the AEDPA standard." <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 70 (1st Cir. 2009). Thus, "to establish constitutionally ineffective assistance of counsel as a ground for federal habeas relief, [a] petitioner bears a doubly heavy burden" because that petitioner must

contend with both the deferential <u>Strickland</u> standard and the deferential standard required by

§ 2254. <u>Id.</u>

The SJC reasonably concluded that trial counsel was not ineffective for failing to make a motion to suppress where such a motion would not have been successful. Trial counsel cannot be ineffective for not raising a motion to suppress on <u>Miranda</u> grounds because the signing of <u>Miranda</u> cards is an administrative act, as discussed <u>supra</u>. Thus, the SJC reasonably determined that trial counsel was not deficient for failing to make a motion that would not further Petitioner's case.

2.     <u>Invocation of Petitioner's Right to Remain Silent</u>

Additionally, Petitioner claims that the SJC was unreasonable in deciding that the trial judge appropriately admitted the January 24 oral statements despite the fact that police failed to scrupulously honor his right to terminate questioning by resuming interrogation under circumstances designed to facilitate elicitation of statements despite his prior <u>Miranda</u> warnings. More specifically, he argues police: (1) did not honor his <u>Miranda</u> invocations because they ignored his requests for counsel and his attempt to cut off questioning; (2) renewed interrogation on January 24 with questions surrounding the same crime that was the subject of the January 12 interrogation in an attempt to wear down his resistance; and (3) suggested his life was in danger and insinuated it was better to be safe in jail as opposed to dead from retribution.

A per se ban on further interrogation after a suspect has invoked the right to remain silent "would transform the <u>Miranda</u> safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." <u>Grant v. Warden, Me. State Prison</u>, 616 F.3d 72, 76–77 (1st Cir. 2010) (quoting <u>Mosley</u>, 423 U.S. at 102) (holding the "critical safeguard" identified in <u>Miranda</u>

is the suspect's "right to cut off questioning"). In cases where "circumstances lead to a conclusion that the police resumed questioning for no other reason than to induce the defendant to change his mind," a court should hold that police did not scrupulously honor his right to remain silent. United States v. Barone, 968 F.2d 1378, 1385 n.9 (1st Cir. 1992) (quoting Vujosevic v. Rafferty, 844 F.2d 1023, 1029 (3d Cir. 1988)) (noting that suppression is warranted when officers "essentially bluffed [the accused] into agreeing" to give a written statement).

The SJC was not unreasonable when it expressly rejected Petitioner's claim that police did not scrupulously honor his right to remain silent. Even after considering the four Mosley factors Petitioner emphasizes, the SJC determined that sufficient evidence supported the proposition that police honored his Miranda invocation. See Grant, 616 F.3d at 77 (adopting the Mosley factors for examination of police conduct, including "(1) whether police immediately cease the interrogation when the defendant invokes the right to remain silent; (2) whether a significant amount of time passes before questioning is resumed; (3) whether fresh Miranda warnings are provided; and (4) whether the later interrogation is restricted to matters distinct from the former"); see also Mosley, 423 U.S. at 105–06. The SJC reasonably determined the officers honored Petitioner's Fifth Amendment rights, because police: (1) immediately ceased the interrogation on January 12 until Petitioner made his wish to talk known; (2) did not wait a coercive amount of time between the two interrogations; (3) provided fresh Miranda warnings; and (4) restricted their involvement in the second interrogation to recording Petitioner's voluntarily made statements. Santana, 988 N.E.2d at 832–33. The SJC reasonably held trial counsel was not ineffective for failing to raise a motion to suppress that was without merit.

Furthermore, the SJC went through the record to refute Petitioner's arguments concerning the officers' questioning, and cited facts sufficient to support its determination. First, police did

not ignore Petitioner's request for counsel and his attempt to cut off questioning. When asked if he wanted to speak with the officers, Petitioner replied: "I will talk to you, but I'm not signing anything without a lawyer," id. at 832, suggesting he would speak to them but not initially take the further step of signing a written statement. See Connecticut v. Barrett, 479 U.S. 523, 529–30 (1987) (holding that a limited invocation of right to counsel did not prohibit all further discussion with police where defendant agreed to make an oral statement but refused to make a written statement). Police did not question him after he refused to "say anything more," although one detective who had known him previously engaged in "conversation" separate from the line of interrogation. Santana, 988 N.E.2d at 832.

Second, the police did not renew interrogation on January 24 in an attempt to wear down Petitioner's resistance. Rather, Petitioner independently volunteered to speak with the officers and to give a statement, and the officers did not question him until they arrived at the Holyoke police station and he received a second administration of his Miranda warnings, which gave him ample time to consider his choice. Id. at 832–33; see United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir. 2006) (reiterating the "relinquishment of the [Miranda] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Petitioner appeared "willing, even 'eager' to talk, and spoke freely and at length in response to questions," which indicated he voluntarily initiated the conversation. Santana, 988 N.E.2d at 837.

Finally, the officers did not coercively suggest Petitioner's life was in danger. After he asked how his sister was doing, the officers restated a conversation they had had with her in which she said that she "had spoken with officers because she would 'rather' see [him] locked up, so [she] can see him, talk to him, and write to him. He would still be here with the family,'

rather than dead on the street." Id. at 832. Therefore, the SJC reasonably determined there was no prejudicial error in admitting the January 24 oral statements, because the officers did not violate Petitioner's rights by recording his statements after he voluntarily began speaking with police and he acknowledged his understanding of the Miranda warnings. See Rojas-Tapia, 446 F.3d at 4 (explaining Miranda rights have been waived only if the circumstances "reveal both an uncoerced choice and the requisite level of comprehension").

        3.      <u>Suppression of Petitioner's Oral Statement</u>

Petitioner also argues that the SJC unreasonably applied Miranda and its progeny by concluding that "the period during which the defendant was held in New Jersey 'had no effect upon the defendant's feely made decision to speak with' Massachusetts police on January 24." Santana, 988 N.E.2d at 840. Furthermore, he asserts that the police allegedly stranded him in the New Jersey jail for twelve days to develop new information before reinitiating interrogation, which increased the coercive environment of the interview. His argument contains four parts: (1) delay without counsel was presumptively coercive in the context of a dishonored request for counsel; (2) police failed to scrupulously honor his Miranda invocations by deliberately delaying retrieving him as a strategy for wearing down his resistance to interrogation, and then testified falsely about the circumstances of the delay; (3) police used the delay to develop information for use in interrogation; and (4) trial counsel was ineffective because he did not consider the delay in retrieving Petitioner as grounds for suppression.

The SJC laid out its careful reasoning as to why it upheld the trial judge's decision concerning the delay and the Miranda issues, and its decision was not unreasonable. First, detectives did not attempt to continue the interrogation without Petitioner's permission, and his own trial counsel "viewed a delay of four days as comparatively brief for an out-of-State

rendition, as did the police officers." Santana, 988 N.E.2d at 840. Second, the trial judge

concluded that police did not deliberately delay retrieving Petitioner as a strategy for wearing

down his resistance to interrogation because the officers did not try to "gain some advantage."

Santana, 988 N.E.2d at 840. Although the SJC conceded that the officers' weather justification

proved to be untrue, it reasonably held that the trial judge's ruling was not an unrealistic

interpretation of the record. Third, while police did gather additional information during

Petitioner's confinement, the SJC reasonably affirmed the trial judge's conclusion that they had

legitimate reasons for the delay unrelated to their investigation, including "the need to coordinate

schedules between police departments, to obtain approval for travel and arrange paperwork, to

set up interviews requiring the presence of New Jersey detectives while the Massachusetts

officers were in New Jersey, and to devote time to other investigations for which they had

responsibility." Id. Petitioner has not adequately explained how the trial judge's factual findings

were unreasonable, nor is it apparent to the Court that these findings were not reasonable based

on the officers' corroborating testimony and the lack of support for coercion in the record.[3]

Petitioner also argues that trial counsel was ineffective because he did not consider the

delay in retrieval as grounds for suppression and because he never argued that the continued

interrogation after Petitioner cut off questioning was grounds for suppression. "[T]he 'Sixth

Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of

hindsight." Sleeper, 510 F.3d at 38 (quoting Yarborough v. Gentry, 540 U.S. 1, 5, 8 (2003)

---

[3] Petitioner cites Barone, 968 F.2d at 1385 for the idea that the delay "magnified the inherent coercion of being held in custody," but there are many factual distinctions between the two situations. While officers in Barone suggested the accused would be in substantial danger if he returned to Boston without cooperating, never gave him full Miranda warnings, did not ask if he had changed his mind about remaining silent before asking him questions, and used tactics intended to lower the accused's guard against incriminating himself, Petitioner voluntarily gave his statement, as established above.

(holding counsel has "wide latitude in deciding how best to represent a client"). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Hinton v. Alabama, 571 U.S. 263, 274 (2014). "A defendant's failure to satisfy one prong of the Strickland analysis obviates the need for a court to consider the remaining prong." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (citing Strickland, 466 U.S. at 697). Here, Petitioner stated that trial counsel explained that he did not file a motion to suppress on this basis because he had seen similar delays in cases involving state probation warrants. The SJC was not unreasonable in holding that counsel was not ineffective for his strategic decision to avoid filing a motion that the judge would not have granted. Habeas relief, therefore, is denied as to Ground III.

### D.   Ground Four: Fourth Amendment Claims

In his fourth ground for relief, Petitioner claims the trial judge should have suppressed the pawn ticket, chain, and all evidence derived from these items as they were seized in violation of the Fourth Amendment, and the SJC was unreasonable in holding that a violation, if any, was not prejudicial. More specifically, he argues: (1) the search was investigatory rather than plain view; (2) the ticket was not immediately and apparently incriminating; (3) trial counsel was ineffective; and (4) he suffered prejudice from the investigation.

As an initial matter, this Court cannot grant relief on the merits of Ground IV, because "a federal habeas court ordinarily cannot revisit a state court's disposition of a prisoner's Fourth Amendment claims." Sanna v. DiPaolo, 265 F.3d 1, 8 (1st Cir. 2001) ("[T]he Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." (quoting Stone v. Powell, 428 U.S. 465, 482 (1976))). "[A] federal habeas court lacks the authority, under

Stone, to second-guess the accuracy of the state court's resolution of those claims." Sanna, 265 F.3d at 8; see Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978).

Moreover, the SJC reasonably concluded that, even if counsel's failure to raise the Fourth Amendment claims reflected subpar performance, there was no prejudice to Petitioner. See Stephens v. Hall, 294 F.3d 210, 218 (1st Cir. 2002) ("In weighing the prejudicial effect of counsel's errors, [a court] must consider the totality of the evidence before the judge or jury."). The SJC identifies "ample other evidence concerning the chain, from Garcia, who saw Gregory Sr. wearing it on the morning of the shooting, described it, and drew a picture of the distinctive links; from the defendant's sister in New York, who saw him wearing it on January 4; and from Cotto's detailed testimony." Santana, 988 N.E.2d at 845. Additionally, in his statement to police, Santana described "taking the chain from around Gregory Sr.'s neck, wearing it 'rocking . . . with respect' for Gregory Sr., and pawning it in New Jersey." Id. As such, the SJC's determination that trial counsel was not ineffective for failing to move to suppress the pawn ticket and chain was not unreasonable.

At the end of his petition, Santana also contends that police violated the Fourth Amendment by deliberately delaying his presentment to a judicial officer. This claim fails for two reasons. First, a habeas court cannot revisit Fourth Amendment claims, as discussed supra in reference to the pawn ticket. See Sanna, 265 F.3d at 8. Second, the SJC was reasonable in its conclusion that neither the Massachusetts nor the Jersey City police delayed presentment in order to coerce the defendant. Santana, 988 N.E.2d at 839–840. Furthermore, the SJC reasonably looked at "the totality of the circumstances" in support of its decision. Id. at 840. "'[T]he involvement of the Jersey City police was limited to arresting the defendant on the fugitive charge, holding him in custody, and providing facilities where the Massachusetts officers could

interrogate [him].' . . . Massachusetts and Jersey City police were not 'acting in concert,' and . . . the Jersey City police believed that their only role was to keep the defendant in custody until Massachusetts officers arrived." Id. Therefore, all of Petitioner's Fourth Amendment claims are without merit.

### E.  Ground Five: Other Constitutional Claims

Petitioner next contends that other serious constitutional errors require reversal, including that: (1) trial counsel rendered ineffective assistance for failing to challenge a juror who had a past attorney-client relationship with the prosecutor; and (2) the trial judge's rulings violated his right to due process, right to remain silent, and right against self-incrimination by ordering him to testify before New Jersey officers or not at all, and by refusing to limit his cross-examination.

#### 1.  Failure to Challenge Juror

Petitioner argues trial counsel rendered ineffective assistance for failing to challenge a juror who had a previous attorney-client relationship with the prosecutor, who considered the prosecutor a personal friend, and who had a current doctor-patient relationship with the prosecutor. In reply, Respondent asserts the record supports the SJC's conclusion that trial counsel's actions did not create a substantial likelihood of a miscarriage of justice. See Santana, 988 N.E.2d at 845 n.21. Although the SJC confined its remarks concerning the juror to a footnote, and did not explicitly outline its reasoning for holding trial counsel's failure to challenge the juror was non-prejudicial, Petitioner does not adequately support the proposition that counsel was ineffective for failing to strike a juror with bias where that bias is inferred from the circumstances. See Sanders v. Norris, 529 F.3d 787, 793 (8th Cir. 2008) (explaining implied bias may be inferred where, for instance, the juror was an employee of the prosecutor, a close relative of anyone related to the criminal case, a witness to the criminal transaction or involved

in it, or potentially substantially emotionally involved); Fields v. Brown, 503 F.3d 755, 772 (9th Cir. 2007) ("[I]t is well accepted that bias may be presumed only in 'extreme' or 'extraordinary' cases."); United States v. Ceja, 451 F.2d 399, 401 (1st Cir. 1971) (holding the challenger has the burden of persuasion to demonstrate that a juror was impartial). As his sole support, Petitioner cites Miller v. Webb, a case from the Sixth Circuit that reversed a District Court's denial of habeas relief after a juror who had known the surviving victim for two or three years was impaneled. 385 F.3d 666, 676 (6th Cir. 2004) (noting counsel's failure to respond to the juror's statement of bias was objectively unreasonable). In Miller, the juror specifically stated she would be partial to the surviving victim, who was also a key prosecutorial witness, and never unequivocally stated that she could be fair. Id. at 678.

In contrast to Miller, however, Respondent cites to several facts in the record that indicate the SJC reasonably concluded trial counsel's error did not create a substantial likelihood of a miscarriage of justice. First, the motion judge noted the juror was very clear that his relationship with the prosecutor would not compromise his ability to be fair and impartial. See United States v. Kar, 851 F.3d 59, 68 (1st Cir. 2017) (explaining lower court did not commit a clear abuse of discretion by allowing juror who babysat for paralegal assigned to case to serve after she affirmed that she was "sure" her prior relationship would not prevent her from rendering a fair and impartial verdict); United States v. Torres, 960 F.2d 226, 228 (1st Cir. 1992) (holding failure to excuse for cause is clearly not "plain error" after juror, who said she knew the brother of the prosecutor, said she could decide the case impartially). Second, the judge found the prosecutor had left private practice more than ten years before the trial began, so any legal matter in which the prosecutor and the juror had been involved with was clearly at an end. See Corjasso v. Att'y Gen. of Cal., 304 Fed. App'x 567, 569 (9th Cir. 2008) (noting juror's client relationship with a

law partner of the prosecutor was not so extreme or exceptional as to warrant a finding of implied bias); Ford v. Johnson, No. 1:02-cv-1623(JCC), 2004 WL 3321489, at *6 (E.D. Va. Oct. 13, 2004) (explaining there is no per se rule disqualifying jury members because of their acquaintances with the prosecutor and law enforcement officers).

Finally, trial counsel testified during the hearing on Petitioner's motion for a new trial that he had been trained by the Committee for Public Counsel Services to exhaust his peremptory challenges so that issues such as this might be preserved for appeal, and thus had made some attempt at a strategy in his decision-making. See Argencourt v. United States, 78 F.3d 14, 16 (1st Cir. 1996) (holding defendant must overcome the presumption that the challenged action "might be considered sound trial strategy"); Brown v. Murphy, 96 F.3d 1430, 1996 WL 536613, at *1 (1st Cir. 1996) (citing Strickland, 466 U.S. at 689) ("A decision consistent with a reasonable trial strategy cannot support a claim of ineffective assistance of counsel."). In his petition, Petitioner makes no argument that he was prejudiced under Strickland, and thus cannot show that the trial would have culminated in a different result if trial counsel raised the juror issue.

2.     Order of Testimony and Cross-Examination

Petitioner also argues that the trial judge's rulings requiring him to testify before the New Jersey police officers testified or not at all[4] and refusing to limit his cross-examination violated his right to due process, right to remain silent, and right against self-incrimination. Respondent contends these claims are waived because Petitioner did not properly argue and cite to relevant

---

[4] The SJC noted that "[t]he defendant protests also the judge's ruling that, if the defendant were going to testify at the hearing on the motion for a new trial, he would have to do so before the other testimony on the first day; the hearing was then continued so that the parties could attempt to resolve issues with obtaining written statements from the Jersey City police officers, who were unable to appear and testify." Santana, 988 N.E.2d at 845 n.21.

legal authority before the SJC, and offers no developed argument to support his assertions in this Court.

First, Respondent is correct that these claims are waived. Petitioner does not advance any argument on the claims in his memorandum of law, other than the bald statement that the trial judge's rulings violated his rights, accompanied by a single case citation. Second, Petitioner similarly did not argue or cite relevant legal authority in his brief for the SJC. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); Perkins v. Russo, C.A. No. 02-10460-MLW, 2007 WL 2507741, at *3 (D. Mass. Aug. 31, 2007) (citing D. Mass. R. 7.1(b)(1) & R. 1.3); Smiley v. Maloney, No. Civ. A. 01-11648-GAO, 2003 WL 23327540, at *15–16 (D. Mass. Oct. 31, 2003) (holding that claim was waived where a petitioner did not advance any support for the claim in his memorandum of law, did not fairly present the claim to the state courts, and did not raise a claim that could succeed on the merits).

Even assuming Petitioner had properly exhausted the claim in state court and presented adequate argumentation, however, the claim fails on the merits because the SJC was not unreasonable in concluding there was no error in either of the trial judge's decisions. In regard to the order of testimony claim, the SJC reasoned that "the defendant consulted with counsel, was asked if he would testify, and decided not to do so." Santana, 988 N.E.2d at 845 n.21. Petitioner cites to Brooks v. Tennessee. 406 U.S. 605, 611–12 (1972) (holding that a petitioner was deprived of his constitutional right to remain silent when the trial court excluded him from the stand for failing to testify first, prior to any other defense testimony). His reliance on Brooks is misplaced, however, because the SJC reasonably approved of the trial judge's decision to continue the hearing so the parties could obtain written statements from the New Jersey officers,

who were unable to appear and testify in Massachusetts on the day that Petitioner was set to testify had he chosen to do so. Unlike Brooks, which concerned a statute requiring the defendant to testify first at trial or not at all, here, the Petitioner objects to the order of testimony at a post-trial hearing on his motion for a new trial. Petitioner was offered the opportunity to testify at the hearing but chose not to do so after consulting with counsel. He does not explain how this violated his right against self-incrimination in the same way as the statute at issue in Brooks.

Moreover, Petitioner's argument that he was entitled to limit cross-examination is also unavailing. "[A] defendant who takes the stand [on] his own behalf cannot then claim the privilege against cross-examination on maters reasonably related to the subject matter of his direct examination." Ohler v. United States, 529 U.S. 753, 759 (2000) (quoting McGautha v. California, 402 U.S. 183, 215 (1971)) ("It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination."). The Supreme Court has recognized:

> Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.

Fitzpatrick v. United States, 178 U.S. 304, 315 (1900). Therefore, habeas relief is denied as to Ground V.

### F.    Ground Six: Voluntary Intoxication and Cocaine Insanity

Although Petitioner did not include a sixth ground in his petition, the Court ordered Respondent to address the grounds raised in Petitioner's Motion for Stay and Abeyance and Motion for a New Trial, namely, that counsel was ineffective for failing to request a voluntary

intoxication instruction and to raise a cocaine insanity defense. Respondent asserts that these claims are waived both because Petitioner failed to include the arguments in his petition and because the claims are time-barred. In addition to contending that Petitioner's claims fail procedurally, Respondent also argues that Petitioner did not meet his burden of establishing that counsel's representation fell below an objective standard of reasonableness under Strickland.

      1.    Procedural Issues

"[F]ederal courts apply the doctrine of comity," as "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." Rose v. Lundy, 455 U.S. 509, 518 (1982) (holding a federal district court must dismiss a state prisoner's habeas corpus petition containing both unexhausted and exhausted claims). "Procedural default—an adequate and independent state law rule—bars federal habeas relief so long as it is both firmly established and regularly followed." Logan v. Gelb, 790 F.3d 65, 72 (1st Cir. 2015) (holding Massachusetts regularly enforces the rule that a claim not raised on direct appeal is waived). To bring unexhausted issues, where not plead in the original petition, a petitioner must seek leave to amend the petition to include them. See 28 U.S.C. § 2242; Fed. R. Civ. P. 15(a). "An amended habeas petition does not relate back (and thereby avoid AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original pleading." Mayle v. Felix, 545 U.S. 644, 645 (2005); see Evans v. Thompson, 465 F. Supp. 2d 62, 72 (D. Mass. 2006) (holding claims "relate back" to the petition only if they "arose out of the same conduct, transaction, or occurrence"). "[I]n the habeas corpus context, the Rule 15 relation back provision is to be strictly construed, in light of Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them]." United

States v. Ciampi, 419 F.3d 20, 23 (1st Cir. 2005) (quoting Mayle, 545 U.S. at 657) (internal quotation marks omitted).

A habeas action asserting unexhausted claims cannot be maintained, and therefore Petitioner's attempt to advance the cocaine insanity defense and voluntary intoxication instruction ineffective assistance claims for the first time in this Court cannot succeed. Furthermore, the unexhausted issues, which were not plead in the original petition, are time-barred. Petitioner has not sought leave to amend the petition to include the additional claims, and his claims do not sufficiently relate back to the original claims such that they may be permitted after AEDPA's one year limitations period has run.

2.    Substantive Issues

Petitioner first asserts that trial counsel was ineffective in failing to present a cocaine psychosis defense, which he claims would have demonstrated he was not responsible for his actions because he did not have the intent to satisfy the malice element needed to form the mens rea for first degree murder. "Defense counsel is allowed to make strategic decisions, within the wide bounds of professional competence, as to which leads to follow up, and on which areas to focus his energies." Phoenix v. Matesanz, 233 F.3d 77, 84 (1st Cir. 2000) (holding counsel's failure to use specific evidence at trial was reasonable, even though it would have been helpful to the defendant's case); see Genius v. Pepe, 147 F.3d 64, 67 (1st Cir. 1998) ("'[C]ounsel . . . is not required to pursue every path until it bears fruit or until all available hope withers.'" (quoting Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984))). "Counsel has 'wide latitude in deciding how best to represent a client,' . . . and benefits from a strong presumption that he or she rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions." Sleeper, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Gentry, 540 U.S. at 5–

6). "[C]ounsel's performance was not deficient if he declined to pursue a futile tactic." <u>Vieux v. Pepe</u>, 184 F.3d 59, 64 (1st Cir. 1999) (citing <u>United States v. Wright</u>, 573 F.2d 681, 684 (1st Cir. 1978)). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Knight</u>, 447 F.3d at 15 (quoting <u>Strickland</u>, 466 U.S. at 689). Trial counsel's abandonment of a cocaine psychosis defense was a strategic judgment that did not fall below an objective standard of reasonableness. For example, trial counsel may have decided that introducing evidence of Petitioner's drug use would paint him in an unfavorable light, and may have determined that bringing up the drug use would be more prejudicial than helpful to Petitioner's cause. This would reflect a reasonable strategic judgment, not reversible error.

Moreover, Petitioner posits that trial counsel was ineffective in failing to request that the trial court give a voluntary intoxication defense. Petitioner asserts that the evidence indicated that he was high on cocaine when he committed the murders, that the Commonwealth's case was based on his intoxication, and that the verdict demonstrates the jury believed he was high. The Court should not speculate about the jury's deliberative process, however. <u>See</u> <u>Anderson v. Miller</u>, 346 F.3d 315, 326 (2d Cir. 2003) (explaining there are "universally recognized reasons for shielding jury deliberations from post-trial review"); <u>Mollett v. Mullin</u>, 348 F.3d 902, 922 (10th Cir. 2003) (noting that courts are "loath . . . to speculate on the deliberative process of a jury"). Furthermore, like the decision to abandon the cocaine psychosis defense, the choice not to request a voluntary intoxication instruction was also a strategic choice within the realm of professional judgment. <u>See</u> <u>Strickland</u>, 466 U.S. at 687. Therefore, habeas relief is denied on Ground VI.

**IV.    CONCLUSION**

Accordingly, the Court <u>DENIES</u> Petitioner's petition for a writ of habeas corpus. [ECF No. 1]. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner. Rules Governing § 2254 Cases, R. 11(a). Here, because Petitioner has raised genuine, non-frivolous issues of constitutional significance, the Court grants Petitioner a certificate of appealability.

**SO ORDERED.**

September 12, 2018                                                    /s/ Allison D. Burroughs
                                                                                ALLISON D. BURROUGHS
                                                                                U.S. DISTRICT JUDGE